******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# UNITED CLEANING & RESTORATION, LLC *v.*
# ANTONIOS KOSKERIDES ET AL.
## (AC 47522)

Alvord, Suarez and Clark, Js.

*Syllabus*

The defendants, commercial property owners, appealed from the trial court's judgment for the plaintiff, a cleaning and restoration construction company, on its breach of contract claim and on the defendants' counterclaim, and from the court's award of attorney's fees to the plaintiff. The defendants claim, inter alia, that the court made clearly erroneous factual findings in connection with its conclusions that the plaintiff had proved its claim that the defendants failed to pay the plaintiff for work performed to repair and remediate the defendants' property after it was damaged in a fire. *Held*:

The trial court's finding that the plaintiff had substantially performed its contractual obligations, despite the defendants' allegation that the plaintiff failed to obtain a warranty for the property's roof, was not clearly erroneous, as this finding was supported by evidence in the record that the plaintiff was unable to obtain the roof warranty due to the defendants' failure to provide instructions to the plaintiff that would have allowed the plaintiff to obtain a final inspection from the roof manufacturer, and this court was not left with a definite and firm conviction that a mistake had been committed.

The trial court's finding that the plaintiff's completion of phase two of the contract constituted substantial performance was not clearly erroneous, as, although the plaintiff's work took longer than the four months specified in the contract, the timeliness of the plaintiff's work was never an issue, from which the court could have concluded that the parties did not intend for time to be of the essence.

The trial court's finding that the plaintiff substantially performed under the contract, despite having failed to obtain a certificate of occupancy, was not clearly erroneous, as the court reasonably could have concluded that the plaintiff's failure did not deprive the defendants of a benefit reasonably expected in light of the terms and scope of the contract, and that the plaintiff, nonetheless, attempted in good faith to procure certificates of occupancy, but was thwarted by the defendants' failure to provide necessary information.

The trial court's finding that the plaintiff substantially performed under the contract, despite having failed to complete work on the restaurant portion of the property, was not clearly erroneous, as the court was entitled to reasonably conclude that the plaintiff's failure to complete the work only minimally deprived the defendants of a benefit that they reasonably expected under the contract, the defendants had been adequately compensated for the unfinished work by virtue of a credit that the plaintiff provided and

honored in pursuing its breach of contract claim, and the plaintiff acted in good faith in attempting to complete all of its required work under the contract.

This court concluded that it did not need to reach the merits of the defendants' claim that the trial court disregarded evidence supporting their valuation of damages in connection with its analysis of the defendants' breach of contract counterclaim, as the defendants failed to challenge the trial court's finding that they bore responsibility for any damages to the property, a finding that was fatal to the defendants' breach of contract claim.

The trial court improperly calculated the award of attorney's fees to the plaintiff, as the plaintiff was not authorized under the language of the parties' contract to recover fees in connection with a third-party complaint it had filed against its insurer because that litigation was not an attempt to recover sums due under the contract and the third-party defendant was not a party to the contract and did not owe the plaintiff any money thereunder.

The trial court properly awarded the plaintiff a full recovery of reasonable attorney's fees in connection with both its prosecution of its own breach of contract claim and its defense of the counterclaim, as the plaintiff's breach of contract claim and the defendants' breach of contract counterclaim arose out of the same factual nucleus, which was the parties' performance of their respective obligations under the contract, and the defendants' counterclaim threatened the plaintiff's ability to enforce the contract and to recover the sums it was owed.

Argued April 14—officially released August 19, 2025

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of New Haven, where the defendants filed a counterclaim; thereafter, Penelope Koskerides, executrix of the estate of Antonios Koskerides, was substituted for the named defendant and counterclaim plaintiff; subsequently, the court, *Young, J.*, granted the plaintiff's motion to cite in Starr Surplus Insurance Company as a third-party defendant; thereafter, the plaintiff filed a third-party complaint; subsequently, the court, *Shah, J.*, granted in part the third-party defendant's motion to bifurcate the third-party action; thereafter, the case was transferred to the judicial district of Middlesex; subsequently, the case was tried to the court, *Swienton, J.*; judgment in part for

the plaintiff on the complaint and for the plaintiff on the counterclaim, from which the defendants appealed to this court; thereafter, the court, *Swienton, J.*, granted the plaintiff's motion for attorney's fees, and the plaintiff filed an amended appeal. *Vacated*; *affirmed in part*; *further proceedings.*

*Frank W. Murphy*, for the appellants (defendants).

*Stephen J. Curley*, for the appellee (plaintiff).

*Opinion*

CLARK, J. The defendants, Penelope Koskerides (Penelope), in her individual capacity and as executrix of the estate of Antonios Koskerides (Antonios),[1] appeal from the judgment rendered by the trial court in favor of the plaintiff, United Cleaning & Restoration, LLC, on both its claim of breach of contract and on the defendants' counterclaim for breach of contract, and from the court's subsequent award of attorney's fees. On appeal, the defendants claim that the court (1) made clearly erroneous factual findings in connection with its conclusions that the plaintiff had proved its breach of contract claim and that the defendants had failed to prove their breach of contract claim, and (2) improperly calculated the plaintiff's award of attorney's fees.[2] We

---

[1] The plaintiff initially filed this action against Penelope and Antonios. On July 26, 2022, however, Antonios died, leaving a will in which he named Penelope as executrix of his estate. Penelope subsequently filed a motion requesting that she be substituted, in her capacity as executrix of Antonios' estate, as a party defendant and counterclaim plaintiff in lieu of Antonios. The court, *Young, J.*, granted that motion on November 28, 2022.

[2] The defendants have also claimed on appeal that the trial court improperly excluded from evidence certain construction cost estimates prepared by one of the defendants' witnesses. The defendants contend that these estimates were relevant to the amount of damages that they sought to prove in connection with their breach of contract counterclaim. Because we affirm the trial court's denial of the defendants' counterclaim on the basis that the plaintiff did not proximately cause any damages to the property; see footnote 8 of this opinion; see also part I D of this opinion; we need not address this claim.

We further note that, in the statement of issues in their principal appellate brief, the defendants identify eleven issues for this court's review. Our

disagree with the defendants' first claim and, therefore, affirm the judgment in the plaintiff's favor on its breach of contract claim and on the defendants' breach of contract counterclaim. Because the court may have improperly awarded the plaintiff attorney's fees that the plaintiff was not authorized to receive under the parties' contract, we conclude that we must vacate the award of attorney's fees and remand the case for a new hearing on the plaintiff's motion for attorney's fees consistent with this opinion.

The following facts, as found by the court or as are otherwise undisputed in the record, and procedural history are relevant to this appeal. The defendants own an eight unit strip mall located at 1-10 Rogers Square in Norwalk (property). In November, 2015, a fire broke out at the property, and the businesses located therein were evacuated. Following the fire, the defendants received a payment of $1.3 million from their insurer to repair and restore the property. An adjuster referred David Koskerides (David), Penelope and Antonios' son, to the plaintiff, which is a cleaning and restoration construction company. The plaintiff, Penelope, and Antonios thereafter entered into a contract for the restoration of the property, which was broken down into two phases. Each phase was accompanied by a scope of work specifying the various tasks to be performed by the plaintiff and the price for each.

The first phase of the contract (phase one) was executed on January 20, 2017. Under phase one, the plaintiff

discussion of these issues is largely subsumed in our analysis of the defendants' overarching claims on appeal. To the extent, however, that any of these issues are mentioned in the statement of issues but not subsequently discussed or developed in the defendants' brief, they have been abandoned. See, e.g., *Ramos* v. *State*, 230 Conn. App. 524, 530, 330 A.3d 278 (2025) ("[when] a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned" (internal quotation marks omitted)).

was required, inter alia, to clean and treat all exposed framing in the property for soot and smoke; to remove and replace damaged masonry at the rear of the property; to remove and replace the roofing system; and to cut, cap, and make safe all utilities within damaged areas of the property. Phase one further required that the plaintiff install a polyvinyl chloride (PVC) membrane roofing system, manufactured by the company GAF, and provide a twenty year manufacturer's warranty for the roof. Phase one was fully paid in the amount of $467,851.29, and the plaintiff has not claimed that the defendants owe it any additional money for services rendered under phase one.

The second phase of the contract (phase two) was executed on May 9, 2017. Under phase two, the plaintiff was required, inter alia, to supply labor and materials necessary to bring all eight units in the property to " 'vanilla' finish level,"[3] and to construct a new front facade for the property. Phase two further specified that the "anticipated start date" for the work under phase two would be "[two] weeks from signing," and that the "anticipated completion date" would be "[four] months from start" but did not state that time was of the essence. Phase two also stated: "[The plaintiff] will turn over finished spaces to be available for rent as they are completed while remaining areas are being completed. This solely depends on the approval of Norwalk city officials." The original written contract price for phase two was $866,495.44, but that price was modified via certain change orders and discounts.

In 2019, the plaintiff stopped working at the property. The trial court found that, at that point in time, all of the work had been completed under phase two, with the exception of work to be performed on Penny's, a restaurant located on the property that the defendants

---

[3] See footnote 10 of this opinion.

owned. At some point in 2018, the plaintiff prepared a change order crediting $25,260 toward the contract price to reflect work that had not been performed at Penny's; the plaintiff subsequently sent that change order to David, but David did not respond or otherwise acknowledge the change order. The defendants ultimately paid $809,948.50 toward phase two, leaving an unpaid balance of $61,350.52.

The plaintiff commenced this action by way of a two count complaint on October 21, 2020. In count one, which sounded in breach of contract, the plaintiff alleged that, with the exception of those items for which it had issued credits, it had fully performed its obligations under the contract and that Penelope and Antonios[4] had failed to pay the full balance owed. In count two, which sounded in unjust enrichment and was pleaded in the alternative to the contractual claim in count one, the plaintiff alleged that it had performed work on the property at Penelope and Antonios' request; that Penelope and Antonios knew that the plaintiff expected to be paid for its work; that the value of the work was greater than the amount Penelope and Antonios had paid for it; and that Penelope and Antonios had unjustly retained the benefit of the plaintiff's work without paying for it.

On March 19, 2021, Penelope and Antonios filed an answer, special defenses, and counterclaim. In their answer, Penelope and Antonios denied that the plaintiff had fully performed its obligations under the contract and denied that any sum was presently due beyond the $890,948.50 that they had already paid. They further denied that the change order reflecting work not performed on Penny's had been accepted. They also asserted three special defenses: (1) that the plaintiff had "forfeited its claim to any balance due on the contract

---

[4] See footnote 1 of this opinion.

because of its failure to perform the contract in a timely and workmanlike manner"; (2) that the plaintiff "is in breach of its contract in that after almost four years of work on the project, it has failed to complete any of the units or obtain a temporary or permanent certificate of occupancy . . . which would permit [Penelope and Antonios] to use and/or rent the units"; and (3) that "[a]ll payments have been made by [Penelope and Antonios] under the terms of the contract." In their counterclaim, Penelope and Antonios claimed that the plaintiff had breached its contract in several ways. Relevant to this appeal, they asserted that the plaintiff had failed to timely complete its work on the contract; failed to obtain a temporary or final certificate of occupancy for any of the units on the property; failed to provide a warranty for the roof; failed to remove obsolete heating, ventilation, and air conditioning (HVAC) units; and performed incomplete and inadequate work on Penny's. They sought, inter alia, compensatory and punitive damages, the cancellation and termination of the contract, and a forfeiture of any amount claimed to be due to the plaintiff.

On April 16, 2021, the plaintiff filed a reply to the special defenses and answer to the counterclaim. The plaintiff claimed in relevant part that its failure to timely complete the project was due to Penelope and Antonios' "delay and inaction in making decisions . . . to resolve issues raised by the [Norwalk] building department with respect to building code requirements"; that it had been unable to obtain temporary or permanent certificates of occupancy "due to [Penelope and Antonios'] failure to comply with [the] requirements for obtaining said certificates"; and that it had failed to provide a warranty for the roof or to remove old HVAC units due to Penelope and Antonios' default in paying moneys due and owing to it. The plaintiff denied certain other allegations regarding its purportedly inadequate work on Penny's.

On November 16, 2022, the plaintiff filed a motion to cite in its insurer, Starr Surplus Insurance Company (Starr), as a third-party defendant, accompanied by a memorandum of law. In this motion, the plaintiff asserted that Starr was "obliged to provide the plaintiff with indemnity and defense for the counterclaim under an applicable liability policy," but that Starr had yet to do so. The plaintiff further argued that "Starr should be cited in as a third party to this action so that the plaintiff may obtain a declaratory judgment from the court as to whether [Starr] must provide the plaintiff with indemnity and defense as to the counterclaim." The court, *Young, J.*, granted that motion on November 28, 2022. Starr was subsequently served with a third-party writ, summons and complaint on December 9, 2022, in which the plaintiff sought a declaratory judgment directing Starr to provide the plaintiff a defense and indemnity for the defendants' counterclaim. On February 23, 2023, Starr filed a motion and accompanying memorandum of law in which it sought to strike the third-party complaint or, in the alternative, to bifurcate the declaratory judgment action from the present action. On June 12, 2023, the court, *Shah, J.*, granted Starr's motion in part and bifurcated the declaratory judgment action from the breach of contract action.[5]

The plaintiff's breach of contract claim and the defendants' counterclaim were subsequently tried before the court, *Swienton, J.*, on October 3, 4 and 11, and November 9, 2023. The plaintiff presented testimony from Nicholas Sarro, its vice president; Steven Martin, an estimator and project manager with a roofing business; Louis Proto, a real estate broker; Carl Cianci, a structural engineer; and John Carlson, the owner of a company

---

[5] Starr filed an answer and special defenses to the third-party complaint on August 1, 2023, to which the plaintiff replied on September 15, 2023. The record reflects that the merits of the third-party complaint have not yet been adjudicated.

that provided, inter alia, air quality and mold remediation services. The defendants presented testimony from David ; Kalonji Diyoka, an environmental consultant ; William Andriopoulos, an architect ; George Shawah, a real estate appraiser ; and James Balazs, a construction manager. The parties submitted voluminous exhibits.

On March 19, 2024, the court issued a memorandum of decision and, thereafter, issued a corrected memorandum of decision on March 27, 2024. The court found in favor of the plaintiff on both count one of its complaint (breach of contract)[6] and on the defendants' counterclaim. With respect to the plaintiff's breach of contract claim, the court concluded that, "[t]o fulfill its obligations under the contract, [the plaintiff] rendered the services set forth in the contract, performing all of its obligations and requirements. The exception to fulfilling all the work would be the completion of the Penny's space. . . . [T]he plaintiff needed to know the intent of the usage of the Penny's space before the work could be completed. Even after numerous attempts to contact David . . . to find out this information, Sarro was unable to learn this needed information. The plaintiff then gave a credit for the work that needed to be done for completion of Penny's . . . ." The court further concluded that "[t]here is no credible evidence to indicate that [the plaintiff] failed to substantially perform its contractual obligations." The court also concluded that the defendants had failed to meet their burden of proof with respect to any of their special defenses.

---

[6] In light of its conclusion that the defendants had breached the parties' contract, the court found against the plaintiff on count two of its complaint (unjust enrichment). See, e.g., *Gagne* v. *Vaccaro*, 255 Conn. 390, 401, 766 A.2d 416 (2001) ("Unjust enrichment applies whenever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract . . . . Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment." (Citation omitted; internal quotation marks omitted.)). Neither party has challenged that portion of the court's judgment on appeal.

With respect to the defendants' counterclaim, the court concluded that the defendants had "spent an inordinate amount of time listing item by item work they believed was not completed or completed incorrectly as well as expenses associated with ownership of the property. However, the defendants failed to submit credible evidence to support these claims, or costs of the repairs or completion, or submit any proof of payment." The court further found "that substantially all of the damage claimed by the defendants was attributable to the negligence or the affirmative conduct of the defendants in that they failed to give to the plaintiff any indication of what needed to be done to complete the job. The defendants allowed the building to stand idle without sufficient HVAC for two to three years, which caused the deterioration now being claimed, including the development of mold. The court credits the testimony of the plaintiff's expert, Carl Cianci . . . . In his submitted report, he . . . found that the claims made by the defendants that certain work was not performed was additional work not included in the contract between the plaintiff and the defendants." Ultimately, the court concluded that the defendants had failed to meet their burden of proving that the plaintiff had proximately caused any damages to the property.

On April 12, 2024, the plaintiff filed a motion for attorney's fees. The defendants filed an objection to the motion on April 26, 2024. On May 29, 2024, the court issued a memorandum of decision and accompanying order in which it awarded attorney's fees in the aggregate amount of $202,372.13, divided among the plaintiff's various counsel. This appeal followed.[7] Additional

---

[7] At the time that this appeal was filed, in April, 2024, the trial court had not yet specified the rate at which prejudgment interest should be calculated. On August 30, 2024, the defendants filed a motion for articulation in which they sought clarification of (1) the date on which prejudgment interest would start to accrue, (2) the prejudgment interest rate to be awarded pursuant to General Statutes § 37-3a (a), and (3) the postjudgment interest rate to be awarded pursuant to § 37-3a (a). The trial court granted that

facts and procedural history will be set forth as necessary.

I

The defendants claim that the trial court erred in concluding that the plaintiff substantially performed its obligations under the contract, and in failing to find in the defendants' favor on their breach of contract counterclaim.[8] In connection with this claim, the defendants direct our attention to various alleged deficiencies

motion and issued a memorandum of decision on October 3, 2024, in which it clarified that prejudgment interest started to accrue on October 15, 2020, and that the prejudgment and postjudgment interest rates would each be 10 percent.

On December 2, 2024, this court, sua sponte, ordered the parties to submit supplemental memoranda addressing whether this appeal should be dismissed for lack of a final judgment "because, when this appeal was filed, there had been no final determination regarding the amount of damages where the trial court had not yet specified the rate at which prejudgment interest should be calculated, and the defendants did not amend their appeal after the court subsequently specified the rate." On January 8, 2025, this court ordered that the appeal would be dismissed unless an amended appeal was filed on or before January 21, 2025. On January 14, 2025, the defendants filed an amended appeal in accordance with this court's order.

[8] In claiming that the trial court disregarded the plaintiff's allegedly defective work, the defendants appear to challenge *both* the court's conclusion that the plaintiff substantially performed under the contract, as a condition of the plaintiff's recovery on its breach of contract claim, and the court's failure to conclude that the plaintiff breached the contract, as an element of the defendants' breach of contract counterclaim. These challenges, although closely related, are logically distinct, because this court has recognized that even a breach that does not amount to a failure to substantially perform may nonetheless provide a basis for liability on a breach of contract claim. See, e.g., *669 Atlantic Street Associates* v. *Atlantic-Rockland Stamford Associates*, 43 Conn. App. 113, 132 n.9, 682 A.2d 572 ("[w]e note that the defendant is entitled to a jury trial on two counts of his counterclaim [alleging fraudulent inducement, breach of contract, and breach of lease], even though the trial court properly determined that the defendant would not be excused from performance if the defendant proved its allegations"), cert. denied, 239 Conn. 949, 686 A.2d 126 (1996), and cert. denied, 239 Conn. 950, 686 A.2d 126 (1996). For the reasons we set forth in part I of this opinion, we conclude that the court's conclusion that the plaintiff substantially performed its contractual obligations was not clearly erroneous. We need not reach, however, the merits of any separate and distinct claim by the defendants that the court, in analyzing their counterclaim, improperly failed to find a breach by the plaintiff, because, as we discuss in part I D of this

in the work performed by the plaintiff and certain evidence pertaining to the value of their damages that, they contend, the trial court overlooked in reaching its conclusion. We are not persuaded.

Because the trial court concluded that the plaintiff had substantially performed its obligations under the contract and that the defendants had failed to establish a causal link between the plaintiff's alleged breaches and their claimed damages, we begin with a brief discussion of the legal principles relevant to those conclusions. "The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." (Internal quotation marks omitted.) *Bross* v. *Hillside Acres, Inc.*, 92 Conn. App. 773, 780–81, 887 A.2d 420 (2006). "Although this court has intimated that causation is an additional element thereof . . . proof of causation more properly is classified as part and parcel of a party's claim for breach of contract damages. . . . The causation requirement focuses on whether a loss may fairly and reasonably be considered [as] arising naturally, i.e., according to the usual course of things, from such breach of contract itself. . . . [U]nder Connecticut law, the causation standard applicable to breach of contract actions asks not whether a defendant's conduct was a proximate cause of the plaintiff's injuries, but rather whether those injuries were foreseeable to the defendant and naturally and directly resulted from the defendant's conduct." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Meadowbrook Center, Inc.* v. *Buchman*, 149 Conn. App. 177, 186–89, 90 A.3d 219 (2014). "The requirement of proximate cause is a less severe limitation of liability than the requirement of anticipation or foreseeability in breach of contract cases. A proximate cause is [simply]

---

opinion, we affirm the court's conclusion that any breach of contract by the plaintiff did not proximately cause damages to the defendants.

[a]n actual cause that is a substantial factor in the resulting harm . . . .” (Internal quotation marks omitted.) Id., 188. “Causation [is] a question of fact for the [fact finder] to determine . . . and, thus, is governed by the clearly erroneous standard of review.” (Internal quotation marks omitted.) *Winakor* v. *Savalle*, 198 Conn. App. 792, 813, 234 A.3d 1122 (2020), aff’d, 343 Conn. 773, 276 A.3d 407 (2022).

“The doctrine of substantial performance,” meanwhile, “shields contracting parties from the harsh effects of being held to the letter of their agreements. Pursuant to the doctrine of substantial performance, a technical breach of the terms of a contract is excused, not because compliance with the terms is objectively impossible, but because actual performance is so similar to the required performance that any breach that may have been committed is immaterial.” (Internal quotation marks omitted.) *EH Investment Co., LLC* v. *Chappo, LLC*, 174 Conn. App. 344, 367 n.12, 166 A.3d 800 (2017). “[T]he general rule is that a contractor who substantially performs under a building or construction contract is entitled to recover the contract price minus the cost of repairing the defects or completing the unfinished part of the work so as to bring the construction up to the level required by the contract . . . .” (Internal quotation marks omitted.) *Coppola Construction Co.* v. *Hoffman Enterprises Ltd. Partnership*, 157 Conn. App. 139, 160–61, 117 A.3d 876, cert. denied, 318 Conn. 902, 122 A.3d 631 (2015), and cert. denied, 318 Conn. 902, 123 A.3d 882 (2015).

“Although the issuance of a certificate of occupancy may be evidence of substantial performance, it is not dispositive of the question. . . . Other factors to be considered include the extent to which the injured party will be deprived of the benefit reasonably expected, the extent to which that party can be adequately compensated for the deficiency of performance, the extent

to which the performing party will suffer forfeiture, the likelihood that the performing party will cure his failure in light of the circumstances and his reasonable assurances, and the extent of good faith and fair dealing on the part of the performing party." (Internal quotation marks omitted.) *Pettit* v. *Hampton & Beech, Inc.*, 101 Conn. App. 502, 508, 922 A.2d 300 (2007). "The determination of [w]hether a building contract has been substantially performed is ordinarily a question of fact for the trier to determine. . . . We have long held that a finding of fact is reversed only when it is clearly erroneous. A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . Simply put, we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses. . . . Moreover, [t]he analysis necessarily involves an inquiry into the totality of facts and circumstances surrounding the performance of the contract." (Citation omitted; internal quotation marks omitted.) *DuBaldo Electric, LLC* v. *Montagno Construction, Inc.*, 119 Conn. App. 423, 429–30, 988 A.2d 351 (2010).

A

The defendants first claim that the trial court's finding that the plaintiff had substantially performed its contractual obligations was clearly erroneous because the evidence before the court allegedly established both that the plaintiff had failed to provide a twenty year manufacturer's warranty for the roof, as required by phase one, and had failed to properly install the roof such that it would be eligible for that warranty. We disagree.

The following additional facts are relevant to the defendants' claim. The plaintiff did not provide the defendants with a warranty for the roof. Sarro testified that this warranty was to be issued by the manufacturer of the roofing system, GAF, and that GAF would have issued the warranty upon a final inspection of the roof. Sarro further testified, however, that he had been unable to call for a final inspection of the roof because he had never received instructions from the defendants regarding the disposition of certain rooftop HVAC units. Sarro explained that "there was no direction on all the units as far as how we were going to be replacing them. So, just to give context to what I'm saying, is that, in a larger—for instance, above the Penny's space, if the Penny's space were to be used as a restaurant as it was, as it sat, the curb[9] would most likely stay the same size. If it was going to be reduced to a vanilla box[10] or if it was going to be a different type of restaurant, then the curbs would likely shrink and/or become larger, whatever they depended on doing, so you couldn't do an exact slash of anything until you knew what was going on." (Footnotes added.) The plaintiff's counsel subsequently asked Sarro if there was "anything that [the plaintiff] needed to do in order to obtain that warranty . . . [a]side from actually asking," to which Sarro replied that there was not.

Andriopoulos testified that he had been contacted by David in September, 2021, and had inspected the roof at least three times. During one of his inspections in

---

[9] Sarro later clarified that a "curb" is "what [the] rooftop units sit on top of."

[10] "Vanilla box" has been defined as "a trade term which means space enclosed by sheetrock walls, taped and ready for a final finish." *Ginsburg* v. *Savin Rock Seafood, Inc.*, Docket No. CV-94-096537, 1995 WL 476809, *1 (Conn. Super. July 14, 1995); see also, e.g., *Bernblum* v. *Grove Collaborative, LLC*, 211 Conn. App. 742, 747–48, 274 A.3d 165 (witness testified that "vanilla box" meant that "everything is painted white, you have carpeting, and a ceiling, heat, utilities, electric" (internal quotation marks omitted)), cert. denied, 343 Conn. 925, 275 A.3d 626 (2022).

October, 2021, Andriopoulos took twenty-two photographs, which were entered into evidence as full exhibits. He testified, inter alia, that certain of these photographs captured standing water on the roof that was attributable to folding of the roof membrane; that he had observed an opening in the roof that could allow water to get through; that certain pipes on the roof had not been capped; and that he had observed that certain objects on the roof appeared to be coming apart from the roof membrane, "which is a source for a water leak or a possible water leak." Andriopoulos also testified, however, that he had never worked as a roofing contractor; that he had never worked on a roof; that he had "probably never" appeared in court previously to give his opinion regarding a roof; and that he had not seen a roof of the type on the property in recent memory. He also did not testify as to the requirements for obtaining a GAF warranty or provide any testimony as to what work, if any, would be required to obtain such a warranty for the roof. He did, however, prepare a report regarding the additional work that, in his opinion, was required for the building to obtain a certificate of occupancy; see part I B of this opinion; in that report, he stated that "[c]lient wants complete new roof—for a completed project and warranty."

Balazs testified that he personally had inspected the roof, that he previously had installed the type of roofing on the roof "hundreds of times," and that the roof was "incomplete and poorly installed" in various respects. He testified that "you can't get a warranty from a roof that is improperly installed because whoever—whether it be Firestone, GAF, any of the big roofing . . . manufacturers, the minute you buy the product from them, it has to be installed as per their specifications and when the roof is done they do a personal inspection in order to get the warranty. And this wasn't in—it wasn't done so they never would've gotten a warranty."

Martin testified that he had worked in the roofing business for thirty-seven years and had inspected the roof in July, 2023. He stated that, when he had inspected the roof, he had "seen a lot of unfinished details because the project to me didn't seem like it was completed," but that he had not observed any defective work, holes in the roof, or evidence of water intrusion. He conceded, under cross-examination by the defendants' counsel, that certain of the areas where he had observed incomplete work were areas of potential water leakage, but repeatedly denied that the roofing work he had observed had been defective, as opposed to merely unfinished. He did not testify as to the requirements for obtaining a warranty or express any opinion as to whether the roof satisfied those requirements.

The defendants contend that Andriopoulos', Balazs', and Martin's testimony each established that there were "defects in the roof construction which would have prevented the provision of the twenty year warranty by GAF," and that "there is no adequate explanation by [the plaintiff] for its failure to properly install the roof or [its] failure to provide the twenty year roof warranty." As a preliminary matter, the defendants mischaracterize Martin's testimony, because he did not testify that the roof as installed would have been ineligible for a GAF warranty and he repeatedly testified that he had *not* observed any defective work on the roof. More to the point, however, the court had before it testimony from Sarro—who also testified to his substantial construction experience[11]—that the plaintiff did not need to do any additional work to obtain a warranty from GAF, and that the only obstacle to securing that warranty

[11] Sarro testified that he had worked as the plaintiff's vice president for eleven years; that prior to working for the plaintiff, he had worked as vice president of operations for a national roofing and masonry restoration company for seven years; that prior to that, he had worked as an estimator and project manager for a large general contractor; and that, in total, he had worked in the construction business for more than twenty-one years.

was the defendants' failure to provide the plaintiff with instructions as to the disposition of the rooftop HVAC units, which prevented the plaintiff from calling for a final manufacturer's inspection. To the extent that this testimony conflicted with other witnesses' testimony or other evidence in the record, it was "the exclusive province of the [trial court] to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none" of Sarro's testimony; (internal quotation marks omitted) *Delena* v. *Grachitorena*, 216 Conn. App. 225, 231, 283 A.3d 1090 (2022); and we will not disturb its determination on appeal. The court therefore reasonably could have concluded that the plaintiff had substantially performed its contractual obligations with respect to the roof warranty. See, e.g., *EH Investment Co., LLC* v. *Chappo, LLC*, supra, 174 Conn. App. 367 n.12 (defendant substantially performed contract obligation requiring it to obtain loan commitment despite failure to secure loan commitment letter when, even assuming such letter was required under terms of contract, defendant "had found a willing lender and all that remained to secure a formal commitment was the signing of the [loan] application," which plaintiff refused to do); *DuBaldo Electric, LLC* v. *Montagno Construction, Inc.*, supra, 119 Conn. App. 430–31 and n.7 (affirming conclusion that plaintiff substantially performed under construction contract when plaintiff's failure to complete required electrical work on schedule was due to delay in issuance of permit that was attributable to defendants and not fault of plaintiff). Because this finding is supported by evidence in the record, and we are not left with a definite and firm conviction that a mistake has been committed, it is not clearly erroneous.

### B

Next, the defendants claim that the trial court's finding that the plaintiff substantially performed was clearly

erroneous because the evidence established that the plaintiff failed to complete the work under phase two within four months and that the plaintiff failed to provide certificates of occupancy for any of the units. We disagree.

1

The following additional facts are relevant to the defendants' claim with respect to the timeliness of the plaintiff's work under phase two. As we previously have explained, phase two was executed on May 9, 2017, and provided that the "anticipated completion date" for the work under phase two would be "four months from start." Sarro testified that the plaintiff started work on phase two in September, 2017. He further testified that the plaintiff completed its work under phase two, with the exception of work on Penny's, but he provided inconsistent testimony as to the precise point in time at which the work was completed. At one point, for instance, Sarro testified that the work had been completed under phase two (Penny's excepted) as of March, 2018; at another point, he stated that the work under phase two was ongoing through early 2019. Sarro further testified that, while the plaintiff was working at the property, it never received any complaints from the defendants about the quality or timeliness of its work. In its memorandum of decision, the trial court found that the plaintiff had "ceased working at the property some time in 2019," at which point in time "[a]ll the work was completed under . . . phase two . . . with the exception of work to be performed in the Penny's space." The court further found that, "[d]uring the period of the restoration and reconstruction, the plaintiff never received any complaints about the work, quality, or timeliness."

The defendants argue that "[r]egardless of whether the start date and completion date [for phase two] are

measured from the date of the contract in May, [2017] or the date of the initial payment in August, [2017] or in mid-September, [2017] it is clear that the work was not completed on phase two for all units except Penny's . . . within four months." The defendants, however, overlook the fact that phase two did not provide that time was of the essence. It is well established that "[w]here a time for performance is stated in an agreement, a party's tender of performance within a reasonable time thereafter will be considered substantial performance unless the parties intended that time for performance be of the essence. . . . Where the agreement does not specifically state that time is of the essence, it is presumed not to be unless the parties have expressed a contrary intent. . . . The fact that a contract states a date for performance does not necessarily make time of the essence." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *JPMorgan Chase Bank, N.A.* v. *Cam*, 172 Conn. App. 659, 666, 161 A.3d 650 (2017); see also *Miller* v. *Bourgoin*, 28 Conn. App. 491, 498, 613 A.2d 292 (observing that, "[b]ecause delays are typical in transactions involving real property or building contracts, time is ordinarily not of the essence in these contracts"), cert. denied, 223 Conn. 927, 614 A.2d 825 (1992). In the present case, the court made no findings that the parties ever intended for time to be of the essence; to the contrary, it found that the plaintiff never received any complaints about the timeliness of its work while it was working at the property, from which the court reasonably could have concluded that the parties did *not* intend for time to be of the essence.[12] See, e.g.,

---

[12] The defendants claim that this finding was clearly erroneous because "there was constant discussion about the slow progress of the work." Because this claim consists of two sentences, unsupported by any citations to record evidence, it is inadequately briefed. See, e.g., *State* v. *Jose A. B.*, 342 Conn. 489, 528 n.29, 270 A.3d 656 (2022) ("Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and

*Mihalyak* v. *Mihalyak*, 11 Conn. App. 610, 616–17, 529 A.2d 213 (1987) (in absence of contractual language stating that time was of essence, court considered testimony as to parties' intent). The court therefore was entitled to conclude that, notwithstanding any failure by the plaintiff to complete the work under phase two within four months, its substantial completion of this work[13] by 2019 constituted substantial performance.

2

With respect to the defendants' claim that the court overlooked the plaintiff's failure to provide certificates of occupancy for any of the units on the property, the following additional facts are relevant. As we have explained, phase two provided that "[the plaintiff] will turn over finished spaces to be available for rent as they are completed while remaining areas are being completed. This solely depends on the approval of Norwalk city officials." It is undisputed that no temporary or permanent certificate of occupancy was ever provided for any unit on the property; indeed, the plaintiff stipulated to that fact. Sarro testified, however, that the Norwalk building department had refused to issue any such certificate "until the Penny's space was either going to be owner-occupied and they had that in writing as far as what that was going to be, or if it was going to be leased by another tenant. The reason why they would not do that is because there's life safety issues

---

minimal or no citations from the record . . . ." (Internal quotation marks omitted.)). Even if we were to overlook the defendants' failure to adequately brief this claim, however, it fails because the court's finding is supported by evidence in the record, and we are not left with a definite and firm conviction that a mistake has been committed.

[13] At one point in their principal appellate brief, the defendants argue that "the evidence clearly demonstrates that the work was not completed within four months, *and remains incomplete to this day.*" (Emphasis added.) To the extent that the defendants' claim about the timeliness of the work is, in effect, simply a general claim that the plaintiff failed to substantially perform its contractual obligations, we resolve this claim via our analysis of the defendants' various claims of material breach in part I of this opinion.

that can be pertained between a restaurant space and a different space. So, they would not give us any spaces at all. And our contract actually references at the beginning that we would try to turn over each space as they were completed if the building official would allow it." Sarro further testified that he had made various attempts to contact David regarding the disposition of Penny's but had never received direction from him in this regard. The defendants, for their part, do not dispute that David never reached a decision regarding whether Penny's would be owner-occupied or leased to a tenant, but claim that he never did so "due to the [COVID-19 pandemic] and related economic factors involving restaurants in general."

Andriopoulos testified that he had prepared a report concerning the additional work that would be required in order to obtain a certificate of occupancy, and his report was entered into evidence as a full exhibit. In his report, Andriopoulos listed various tasks that, in his view, the plaintiff had not completed but were required to be completed before a certificate of occupancy could be issued, including the remediation of certain mold issues in the property,[14] and the inspection of the property's electrical systems. The plaintiff submitted into evidence a report from Cianci in which Cianci—upon review of, inter alia, Andriopoulos' report—concluded in relevant part that "[w]ork that is alleged to be required to obtain a certificate of occupancy . . . is additional work that was not included in the contract

---

[14] In their principal appellate brief, the defendants—while acknowledging that there was "conflicting testimony" on the subject—appear to argue that the evidence before the court established that there was water seepage and mold in the basement, and that the trial court inappropriately disregarded this evidence when it ruled in the plaintiff's favor. However, in their reply brief, the defendants assert that they have "not appealed with regard to the basement mold," and that "[t]here is no assignment of error" on the subject. We therefore do not consider any claim of error by the defendants pertaining to the trial court's alleged failure to account for the presence of mold on the property.

between [the plaintiff] and [the defendants]." In its memorandum of decision, the trial court credited Cianci's testimony. The trial court further found that "the plaintiff needed to know the intent of the usage of the Penny's space before the work could be completed," and that, "[e]ven after numerous attempts to contact David . . . to find out this information, Sarro was unable to learn this needed information."

We discern no error in the trial court's finding that the plaintiff substantially performed under the contract, notwithstanding that the plaintiff failed to obtain certificates of occupancy. As we previously have explained, in the context of construction contracts, "[a]lthough the issuance of a certificate of occupancy *may* be evidence of substantial performance, *it is not dispositive of the question.* . . . Other [nondispositive] factors to be considered include [inter alia] the extent to which the injured party will be deprived of the benefit reasonably expected . . . and the extent of good faith and fair dealing on the part of the performing party." (Emphasis added; internal quotation marks omitted.) *Clem Martone Construction, LLC* v. *DePino*, 145 Conn. App. 316, 336–37, 77 A.3d 760, cert. denied, 310 Conn. 947, 80 A.3d 906 (2013). The court thus was not required to conclude that the failure to procure certificates of occupancy constituted a failure to substantially perform under the contract. This is especially true in light of the facts that (1) the contract language providing that the plaintiff would turn over completed units to the defendants for rental, contingent "solely . . . upon the approval of Norwalk city officials," provided no guarantee that the plaintiff would be able to secure a certificate of occupancy;[15] and (2) the plaintiff nonetheless repeatedly sought clarification from the defendants regarding

---

[15] We further note that phases one and two both provided in relevant part that, although the plaintiff was responsible for "secur[ing] and pay[ing] for the building permit, fees, licenses, and inspections," "[i]mprovements required by the local or state building code are not the responsibility of the [plaintiff]," and that, "[e]xcept for permits and fees, the [o]wner [i.e., Penel-

the anticipated use of Penny's, which Sarro testified was necessary before a certificate of occupancy could be issued for any of the units on the property. The court reasonably could have concluded, on the basis of these facts and the evidence before it, both that the plaintiff's failure to obtain a certificate of occupancy did not deprive the defendants of a " 'benefit reasonably expected' " in light of the terms and scope of the contract; *Clem Martone Construction, LLC* v. *DePino*, supra, 337; and that the plaintiff nonetheless attempted in good faith to procure certificates of occupancy, but was thwarted by the defendants' failure to provide necessary information. On the basis of our thorough review of the record, we cannot conclude that the court's determination that the plaintiff substantially performed under the contract notwithstanding its failure to obtain a certificate of occupancy is clearly erroneous.

C

The defendants next claim that the trial court erred in finding that the plaintiff substantially performed under the contract despite the fact that it failed to complete the work on Penny's,[16] and that the court improperly overlooked the fact that the work done on

ope and Antonios] shall secure and pay for other necessary charges required for the construction, use or occupancy of permanent structures or permanent changes in existing facilities. Such approvals, assessments and changes may be required by the local building officials for structural improvements based on local code requirements. Payments for any such requirements or improvements will be the responsibility of the [o]wner."

[16] The defendants also claim, in a separate section of their principal appellate brief, that the plaintiff materially breached the contract by failing to remove certain rooftop HVAC units. Sarro testified that the only rooftop units that the plaintiff did not remove were those above Penny's, and the defendants do not dispute this representation on appeal. Sarro further testified that the plaintiff's failure to remove these rooftop units was accounted for in the 2018 change order providing the defendants a credit for work that had not been performed at Penny's. We therefore consider the defendants' argument pertaining to the rooftop units as part and parcel of their contention that the failure to complete work on Penny's constituted a material breach of the contract.

Penny's was contrary to the contract in certain respects. We disagree.

The following additional facts are relevant to our consideration of this argument. The scope of work for phase two originally provided that the cost of work on Penny's would total $46,313.12, although the price was later increased by $1120 (excluding overhead, profit, and tax). The plaintiff, as discussed previously, did not complete the work on Penny's under phase two and sent the defendants a change order crediting $25,260 toward the contract price to account for work that had not been performed on Penny's. The plaintiff did not include that $25,260 as a component of the damages that it sought on its breach of contract claim. Sarro testified that the work on Penny's had not been completed because the defendants had never provided the plaintiff clear information as to whether they intended to rent the space to a tenant—in which case "a lot more work needed to happen as far as code was concerned"—or whether they intended to "remain the owner and operate [Penny's] as an owner operator." He stated that the plaintiff also had not removed any of the rooftop HVAC units above Penny's for the same reason, and, at a later point in his testimony, explained that, "if [Penny's] was going to [be] reuse[d] . . . as a restaurant to either another tenant [or be owner-occupied], it would change how [the equipment in Penny's] was vented through the roof." He further testified that the plaintiff had left Penny's "insulated and [with] rough mechanicals done," but that the plaintiff had not put drywall or a ceiling in place.

The scope of work for phase two originally contained a provision stating: "Penny's pizza space existing floors to remain due to restaurant booths and fixtures to remain." This provision, however, was manually crossed out by a strikethrough next to which David

wrote his initials.[17] Sarro testified that, prior to stopping work, the plaintiff had taken out the tile flooring in Penny's, but that "[w]e weren't touching any restaurant equipment, coolers, hoods, booths, anything that was affixed . . . ." He testified that none of the fixtures in Penny's had been removed. David, to the contrary, testified that, "[a]t one point, the booths were actually going to stay, and so were the tables . . . [but] [the plaintiff] pulled out all the booths . . . . And the cantilevers I asked them to keep, and they threw them out, which hold up the tables." David further claimed that "[t]he tile flooring wasn't supposed to be removed, [only] the carpet was," and that "[t]here was a server stand that was taken out which wasn't supposed to be taken." On cross-examination, however, David acknowledged that he had written his initials next to the strikethrough in the scope of work for phase two, and further admitted that, when he had stated that the tile flooring and server stand were not supposed to be removed, he had been referring to an oral agreement to that effect that, he alleged, he had reached with the plaintiff. He admitted that no such agreement was reflected in the scope of work for phase two, and he was unable to recall which representative of the plaintiff he had struck the alleged agreement with, or whether the alleged agreement had been reached before or after he wrote his initials next to the strikethrough.

The defendants argue that "there was incomplete work [done on Penny's] regardless of whether Penny's would be owner-occupied or not," and further claim that the evidence shows that "contrary to the contract . . . [the plaintiff] removed the booth cantilevers, the server stand, and the tile floor from Penny's." As the record reflects and David conceded, however, the scope

---

[17] The scope of work for phase one, which was executed several months prior to phase two, contained an identical provision, which was not crossed out.

of work for phase two (unlike the scope of work for phase one; see footnote 17 of this opinion) did *not* require that floors, booths, and/or fixtures in Penny's remain in place—indeed, a provision to that effect was stricken from the contract. Moreover, the trial court was required neither to credit nor to afford dispositive weight to David's self-serving claim that he and the plaintiff had reached an oral agreement with respect to the tile flooring and fixtures that contradicted the written modification to phase two, especially in light of David's hazy memory as to when and with whom he struck this alleged agreement.

With respect to the plaintiff's failure to complete the required work on Penny's, we note at the outset that, apart from a single undeveloped assertion in their principal appellate brief,[18] the defendants do not meaningfully contend on appeal that the $25,260 credit that they were issued inaccurately represents the value of the work that the plaintiff left unfinished in Penny's. That credit, $25,260, is roughly 2 percent of the total price for the work on the property prior to the credit's deduction.[19] See, e.g., *Clem Martone Construction, LLC* v. *DePino*, supra, 145 Conn. App. 332–33 (affirming con-

---

[18] The defendants state that $25,260 is "inadequate" to complete the unfinished work on Penny's but provide no support for this conclusory proposition other than by directing our attention to certain photos of the unfinished interior of Penny's, which were entered into evidence as full exhibits.

We note that elsewhere in their brief, the defendants claim damages in at least the hundreds of thousands of dollars due to the plaintiff's alleged breach of contract, resulting from, inter alia, lost rental income, out of pocket expenses, and the cost of repair and restoration. However, the testimony and exhibits to which they point to support these figures consist of cost estimates and payment records that appear to apply to the property as a whole, rather than to Penny's in particular.

[19] In particular, the trial court found that the defendants had paid $467,851.29 for phase one. The trial court further found that "change orders were issued which brought the total cost of [phase two] to $946,559.02" and that "[t]he plaintiff orally agreed to provide the defendants with a discount of $50,000 at the end of the project . . . ." Prior to the subtraction of the $25,260 credit, this yields a total price of $1,364,410.31.

clusion that plaintiff substantially performed under construction contract when trial court found, inter alia, that "[t]he damages as a consequence of [the plaintiff's] substandard performance total barely 2 percent of the contract price" (internal quotation marks omitted)). Moreover, given that $25,260 represented roughly one half of the total cost for the work on Penny's, the court was not required to conclude that a credit of that amount would be insufficient to compensate the defendants for the unfinished work, especially in light of Sarro's testimony that rough mechanicals and insulation had been completed. Finally, there was evidence to support the trial court's finding that the plaintiff repeatedly and unsuccessfully sought clarification from the defendants as to the anticipated use of Penny's and, lacking such information, was unable to complete the work on Penny's. The trial court was thus entitled reasonably to conclude that the plaintiff's failure to complete the work on Penny's would only minimally deprive the defendants of a benefit that they reasonably expected under the contract; that the defendants could be (and had been) adequately compensated for the unfinished work by virtue of the $25,260 credit that the plaintiff provided and honored in pursuing its breach of contract claim; and that the plaintiff acted in good faith in attempting to complete all its required work under the contract. The defendants' claim therefore fails.

D

Finally, the defendants claim that the court—in connection with its analysis of the defendants' breach of contract counterclaim—erred in concluding that they had failed to submit credible evidence to support their estimates of the value of damages allegedly caused by the plaintiff. We conclude that we need not reach the merits of this claim.

In addition to concluding that the defendants had failed to submit credible evidence on which to base a monetary valuation of damages, the trial court also concluded that the defendants had failed to establish that any breach of contract by the plaintiff proximately caused damages to the property. In particular, the court found that "substantially all of the damage claimed by the defendants was attributable to the negligence or the affirmative conduct of the defendants in that they failed to give to the plaintiff any indication of what needed to be done to complete the job" and that "the defendants have failed in their burden of proof that the [plaintiff] proximately caused[20] any damages at the property." (Footnote added.) As we have previously explained, the court's finding that the defendants never provided the plaintiff with the information that it needed in order to fully comply with its contractual obligations is not clearly erroneous. The defendants

[20] In *Meadowbrook Center, Inc.* v. *Buchman,* supra, 149 Conn. App. 188–89, this court explained that, under Connecticut law, proximate cause is not the proper causation standard for breach of contract actions; rather, a court must ask whether the plaintiff's injuries "were foreseeable to the defendant and naturally and directly resulted from the defendant's conduct." In the present case, however, any error resulting from the court's application of the proximate cause standard to the defendants' breach of contract counterclaim does not change our conclusion, because proximate cause—a standard that requires the court to assess only whether the defendant's conduct is an "actual cause that is a substantial factor in the resulting harm"—is a more lenient standard than the causation standard applicable to breach of contract actions. (Internal quotation marks omitted.) Id., 188. In other words, because the court found that the defendants had not established proximate cause, it necessarily could not find that the defendants had satisfied the more stringent causation standard applicable to breach of contract actions.

We further note that some cases have articulated the causation standard applicable to breach of contract actions as requiring the plaintiff to establish that he or she "sustained damages as a direct *and* proximate result of the defendant's breach." (Emphasis added; internal quotation marks omitted.) *O'Donnell* v. *AXA Equitable Life Ins. Co.*, 210 Conn. App. 662, 681, 270 A.3d 751, cert. granted, 343 Conn. 910, 273 A.3d 695 (2022) (appeal withdrawn September 8, 2022). Under this formulation of the standard, it is likewise clear that the court's conclusion that the defendants failed to prove that the plaintiff proximately caused damages at the property was sufficient to dispose of their breach of contract counterclaim.

have not challenged the court's finding that they thereby bore responsibility for any damages to the property. Because this finding is fatal to their breach of contract claim; see, e.g., *Meadowbrook Center, Inc.* v. *Buchman*, supra, 149 Conn. App. 186; we need not reach the merits of their claim that the court improperly disregarded evidence supporting their valuation of the damages.

## II

The defendants next claim that the trial court erred in determining the plaintiff's entitlement to attorney's fees. Specifically, the defendants argue that the court improperly permitted the plaintiff to recover fees incurred in connection with the plaintiff's motion to cite in Starr and its prosecution of its third-party complaint against Starr (Starr litigation), and in connection with the plaintiff's defense against the defendants' counterclaim. We agree in part with the defendants. In particular, we agree that the plaintiff is not entitled to recover attorney's fees from the defendants in connection with the Starr litigation. We further conclude that, because it is unclear the extent to which the court's attorney's fees award incorporates fees incurred in connection with the Starr litigation, the award of attorney's fees must be vacated and the case remanded for a new hearing on the plaintiff's motion for attorney's fees. We reject, however, the defendants' argument that the plaintiff is not entitled to recover attorney's fees incurred in connection with its defense of the counterclaim.[21]

The following additional facts and procedural history are relevant to this claim. Article II, paragraph 3, of both phase one and phase two of the contract provides

---

[21] The defendants also claim that the amount of attorney's fees was excessive and unreasonable. In light of our conclusion that the case must be remanded for a new hearing on attorney's fees, we do not reach the merits of this claim.

that "[o]wner agrees to pay all costs of collection by the [plaintiff] in recovering sums due hereunder, including, but not limited to, [attorney's] fees, pre-judgment costs, post-judgment costs and all other expenses." In connection with this case, the plaintiff retained the services of Attorney Stephen Curley, of the Law Offices of Stephen J. Curley, LLC; Attorneys Jon D. Biller, Scott C. DeLaura, and Brianna K. Robert, of The Biller Law Firm, LLC; and Attorney Robert R. Lewis, of The Law Offices of Robert R. Lewis, Esq. Curley and The Biller Law Firm, LLC, entered appearances for the plaintiff in the Superior Court, but Lewis did not, although Lewis did sign the complaint. The record reflects that Robert was present in court on at least the first day of the trial, but that she only spoke twice, and that Curley examined all the witnesses and conducted all arguments throughout the trial. The record does not reflect that any of the plaintiff's other attorneys, apart from Curley and Robert, were present during the trial.

Following the rendering of judgment for the plaintiff on its breach of contract claim and on the defendants' counterclaim, the plaintiff filed a motion for attorney's fees on April 12, 2024, accompanied by affidavits from Curley and Biller. On May 10, 2024, the plaintiff filed an additional affidavit from Lewis. In its motion and accompanying affidavits, the plaintiff claimed that it had incurred $168,400 in attorney's fees to Curley; $48,822.50 in attorney's fees to The Biller Law Firm, LLC; and $5225 in attorney's fees to Lewis, for a total of $222,447.50. The plaintiff also submitted invoices listing the various tasks its attorneys had performed in connection with the case, the amount of time expended on each task, and the fee for each task. Some of the tasks listed on these invoices clearly pertained to the Starr litigation, such as, for instance, an entry that read "draft and edit third-party complaint." Other task entries, however—such as some that were identified

simply as "attention to file" or that referred to telephone conferences without specifying the subject—did not clearly indicate whether they involved work on the Starr litigation or on some other component of the case. The defendants filed an objection to the motion on April 26, 2024, in which they argued, inter alia, that, by their calculations, approximately $25,000 of the plaintiff's attorney's fees were attributable to the Starr litigation and should be disallowed. In their objection, however, the defendants tacitly acknowledged that simply from examining the plaintiff's invoices they could not state definitively how much of the plaintiff's claimed attorney's fees were attributable to the Starr litigation; at one point, for instance, they contended that "[a]n examination of the hourly entries shows *at least* $15,430.37 was billed for the third-party complaint by . . . Curley alone, *and because of the nature of the entries, it may have been as much as $20,000, or more.*" (Emphasis added.)

On May 29, 2024, following a remote hearing, the court issued a memorandum of decision in which it awarded the plaintiff $202,372.13 in attorney's fees—$20,075.37 less than the plaintiff had requested—divided as follows: $152,969.63 for Curley's services; $44,177.50 for The Biller Law Firm, LLC's services; and $5225 for Lewis' services. In its memorandum of decision, the court stated that it had based its award on "the evidence presented, the arguments of counsel, and the criteria set forth in the Rules of Professional Conduct as well as the court's general knowledge of the file and the proceedings." It did not explain why it had reduced the amount of the award by $20,075.37 from the amount sought by the plaintiff. Nor did it state how much, if any, of the $202,372.13 it awarded was attributable to the plaintiff's counsel's efforts in connection with the Starr litigation. The court acknowledged the defendants' argument that the "insurance coverage

issues are separate and apart from the contract claims by [the plaintiff] and the defenses and counterclaim [of] the defendants," but did not expressly accept, reject, or otherwise analyze this argument. The defendant did not file a motion for articulation, or otherwise seek clarification, of the court's attorney's fees award.

The following legal principles are relevant to our review of this claim. "Connecticut adheres to a basic principle regarding awards of attorney's fees and expenses related to litigation known as the American rule. Under the American rule, attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a [specific] contractual or statutory exception." (Internal quotation marks omitted.) *Ames* v. *Commissioner of Motor Vehicles*, 70 Conn. App. 790, 800, 802 A.2d 126 (2002), aff'd, 267 Conn. 524, 839 A.2d 1250 (2004). In determining whether the recovery of attorney's fees is authorized by a contract, "we apply the well established principle that [a] contract must be construed to effectuate the intent of the parties, which is determined from [its] language . . . interpreted in the light of the situation of the parties and the circumstances connected with the transaction." (Internal quotation marks omitted.) *Total Recycling Services of Connecticut, Inc.* v. *Connecticut Oil Recycling Services, LLC*, 308 Conn. 312, 327, 63 A.3d 896 (2013) (*Total Recycling*). "[The] intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the [writing]." (Internal quotation marks omitted.) *Heyman Associates No. 5, L.P.* v. *FelCor TRS Guarantor, L.P.*, 153 Conn. App. 387, 415, 102 A.3d 87, cert. denied, 315 Conn. 901, 104 A.3d 106 (2014).

"It is well established that we review the trial court's decision to award attorney's fees for abuse of discretion. . . . This standard applies to the amount of fees

awarded . . . and also to the trial court's determination of the factual predicate justifying the award. . . . Under the abuse of discretion standard of review, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *Roach* v. *Transwaste, Inc.*, 210 Conn. App. 686, 692, 270 A.3d 786 (2022), aff'd, 347 Conn. 405, 297 A.3d 1004 (2023). In the present case, however, the defendants' claim requires us to examine the clear and unambiguous language of the parties' contract to determine whether it authorized a recovery of attorney's fees in connection with certain aspects of the litigation—a question over which our review is plenary. See, e.g., *Heyman Associates No. 5, L.P.* v. *FelCor TRS Guarantor, L.P.*, supra, 153 Conn. App. 411; *Trugreen Landcare, LLC* v. *Elm City Development & Construction Services, LLC*, 101 Conn. App. 11, 13–15, 919 A.2d 1077 (2007).

On the basis of the language of the parties' contract, we conclude that the plaintiff was not authorized to recover fees incurred in connection with the Starr litigation. The contractual language of phase one and phase two provided that the defendants would pay "all [of the plaintiff's] costs of *collection . . . in recovering sums due hereunder*," including attorney's fees. (Emphasis added.) The prosecution of the Starr litigation, however, was not an attempt to recover sums due under the contract. Starr was not a party to the contract and did not owe the plaintiff any money thereunder. The outcome of the Starr litigation had no bearing on the amount of the plaintiff's recovery on its breach of contract claim; the Starr litigation was intended to resolve the collateral question of whether Starr was responsible

for defending the plaintiff against the defendants' counterclaim. Cf., e.g., *Connecticut Community Bank, N.A.* v. *Kiernan,* 187 Conn. App. 868, 872, 877, 204 A.3d 97 (provision of note that stated "[i]f we enforce our rights in court, you agree to pay our court costs and attorney's fees" did not impose liability on mortgagor for bank's attorney's fees incurred in protecting priority of its mortgage, where, inter alia, bank "provided no legal or factual basis for extending the explicit language relating to foreclosing its mortgage to a separate claim against another party asserting priority over that other party's lien, nor are we aware of any"), cert. denied, 331 Conn. 911, 203 A.3d 570 (2019). The contract thus did not authorize the plaintiff to recover attorney's fees incurred in its prosecution of the Starr litigation.

We disagree, however, with the defendants' contention that the trial court should have barred the plaintiff from recovering attorney's fees that it incurred in defense of the counterclaim. In support of this contention, the defendants argue that Starr refused to defend against the counterclaim because the plaintiff negligently failed to timely report the counterclaim to Starr. The defendants therefore argue—without citing to any authority—that the plaintiff "should not be awarded attorney's fees for defense of the counterclaim, when its obligation to pay for the defense arose only because of its own misconduct." Even if we were to agree, however, with the general proposition advanced by the defendants—that an insured party's negligence in failing to timely report a litigation adversary's claim to its liability insurer may be a basis for denying it recovery of attorney's fees in connection with that claim—and even if we were to further agree that the plaintiff acted negligently in the present case, we would still not conclude that the trial court should have disallowed the plaintiff's recovery of attorney's fees in connection with its defense of the counterclaim.

Our conclusion is grounded on our Supreme Court's decision in *Total Recycling Services of Connecticut, Inc.* v. *Connecticut Oil Recycling Services, LLC*, supra, 308 Conn. 312. In that case, our Supreme Court held that, "when certain claims provide for a party's recovery of contractual attorney's fees but others do not, a party is nevertheless entitled to a full recovery of reasonable attorney's fees if an apportionment is impracticable because the claims arise from a common factual nucleus and are intertwined." Id., 333; see also, e.g., *Noyes* v. *Antiques at Pompey Hollow, LLC*, 144 Conn. App. 582, 599, 73 A.3d 794 (2013) (trial court properly determined that apportionment of fees between counts on which plaintiff prevailed and counts on which plaintiff lost was unnecessary where "the same facts were relevant to all counts of the plaintiff's complaint"). In the present case, the plaintiff's breach of contract claim and the defendants' breach of contract counterclaim arose out of the same factual nucleus: the parties' performance of their respective obligations under the contract. Moreover, because the defendants' counterclaim sought the cancellation and termination of the contract, as well as the forfeiture of any amounts due to the plaintiff under the contract, the counterclaim threatened the plaintiff's ability to enforce the contract and to recover the sums it was owed. See, e.g., *Diamond D Enterprises USA, Inc.* v. *Steinsvaag*, 979 F.2d 14, 18 (2d Cir. 1992) ("where a fee applicant recovers on a claim subject to a contractual attorney's fee provision and in the process litigates a counterclaim on which he must prevail in order to recover on his claim, then the fee applicant is entitled to his attorney's fees for both the claim and the counterclaim" (internal quotation marks omitted)), cert. denied, 508 U.S. 951, 113 S. Ct. 2442, 124 L. Ed. 2d 660 (1993). The plaintiff was thus entitled to a full recovery of reasonable attorney's fees in connection with both its prosecution of its own

breach of contract claim and its defense of the counter-claim.[22]

We now turn to the scope of our remand. It is unclear—for the reasons we have discussed—whether, and to what extent, the trial court's attorney's fees award incorporates fees incurred by the plaintiff in connection with the Starr litigation. The plaintiff did not apportion its attorney's fees between those that were incurred in connection with the Starr litigation and those that were not, leaving the trial court without a basis from which to definitively determine how much of the plaintiff's fees were connected to the Starr litigation, and excise them from the award accordingly. Accordingly, a new hearing on attorney's fees is necessary. On remand, the plaintiff should be prepared to apportion its attorney's fees between those that are attributable to the Starr litigation and those that are not, and the trial court should ensure that the former are not included in the attorney's fees award.[23]

---

[22] The plaintiff does not argue, however, that the claims it has asserted in the Starr litigation arise out of a common nucleus of fact with its breach of contract claim and the defendants' counterclaim. To the contrary, the plaintiff's motion to cite in Starr and its third-party complaint against Starr assert allegations not pertaining to the plaintiff's or the defendants' performance under the contract for restoration of the property but, rather, pertaining to the terms of the plaintiff's insurance policy and Starr's alleged refusal to defend the plaintiff against the counterclaim. The rule announced by our Supreme Court in *Total Recycling* thus does not allow the plaintiff to recover from the defendants attorney's fees incurred in connection with the Starr litigation, notwithstanding the lack of contractual authorization for such fees.

[23] It is true, as the plaintiff points out, that the defendants did not file a motion for articulation of the court's award of attorney's fees. Under the circumstances of this case, however, we cannot hold the defendants primarily responsible for the lack of clarity in the award. Cf., e.g., *Jacques* v. *Jacques*, 223 Conn. App. 501, 516, 309 A.3d 372 (2024) (remanding case for new hearing on attorney's fees where court improperly awarded defendant attorney's fees without making sufficient factual findings as to plaintiff's bad faith, but where defendant had submitted evidence that court disregarded, meaning that "the defendant, through no fault of her own, was deprived of a full and fair opportunity" to make her case). Because the plaintiff did not apportion its requested attorney's fees between those that were incurred in connection with the Starr litigation and those that were not, the trial

The award of attorney's fees is vacated and the case is remanded for a new hearing on the plaintiff's motion for attorney's fees consistent with this opinion; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

---

court lacked a sufficient evidentiary basis from which it could reliably have determined how much of the plaintiff's attorney's fees were in fact attributable to the Starr litigation. We cannot see how the defendants, for their part—who presumably were not privy to their adversary's confidential communications, discussions, and work product—were in a position to reliably supplement the plaintiff's evidentiary submission by conducting such an apportionment themselves. We therefore do not view the failure to file a motion for articulation as fatal to the defendants' claim.